[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This custodial dispute, arising within a dissolution action, involves a plaintiff wife, aged 42, and a defendant husband, aged 50, who married in Stratford. Connecticut, thirteen years ago, on March 31, 1979. It was the first marriage for each.
There was one minor child born during their marriage:
Amanda Fay Sheiman, born March 8, 1987, aged 5.
They have both resided continuously in this state for the past twelve months. Neither is the recipient of public assistance from the State of Connecticut or any governmental subdivision. Each testifies that their marriage has broken down irretrievably.
FINDINGS: CUSTODIAL
This trial consumed nine days and offered none witnesses. Of those witnesses, defendant father offered two in addition to his own testimony: Catherine Mingolello, his former legal secretary, who spoke well of him and illuminated some financial issues.
Plaintiff mother offered Penny Breslin, her friend, who spoke well of both parents: Carol Rubin, director of young Amanda's school, who rejected all invitations to speak poorly of either parent; Leon Tec, M.D., court ordered psychiatric evaluator; Jeffrey Deitz, M.D., plaintiff mother's therapist; Elaine Haut, Family Relations Counselor and herself.
Dr. Leon Tec was almost cinematic. He adopted firm views and spoke in dramatic sweeping generalities. He recommended that Amanda, because she was under the age of seven, should remain in the custody of her mother. When questioned, he stated that he would change that general principle only if the mother were psychotic or severely drug addicted. All other issues were unimportant. He responded rigidly to questions and was defensive. This court did not find him credible.
As psychiatrists often do, Dr. Tec asked Irving Sollinger, Ph.D., to perform psychological tests on both Deborah and Stuart Sheiman. Dr. Sollinger complied and offered his test results to Dr. Tec. Dr. Tec did not agree with the psychologist's finding that Deborah Sheiman had a borderline personality, nor did he accept Dr. Sollinger's use of the MMPI test in his study. Dr. Tec found Dr. Sollinger to be selectively acceptable. Not having had the benefit or Dr. Sollinger's presence and an opportunity to evaluate him, and in view of his own patron's rejections, this court is unable to rely on the Sollinger studies.
Jeffrey Deitz, M.D., plaintiff mother's psychiatrist since July 13, 1988, testified to seeing her as recently as January CT Page 4309 21, 1992. He spoke of his success in dealing with her bipolar disorder (which he referred to alternatively as hypomania and manic depression). He performed a mental status examination on December 10, 1991 and found her condition had been reduced to depression and anxiety. He said nothing during his direct or cross examination that would damage his ongoing therapeutic relationship with Deborah Sheiman or her quest for custody of Amanda.
Dr. Deitz never met Stuart Sheiman, but he did not hesitate to diagnose him as grossly abnormal if, as Dr. Deitz' patient claimed, upon learning that his wife had joined a dating service, he threw clothing and household furnishings down the stairs, damaging them.
When cross-examined vigorously about his client's behavior with Amanda, Dr. Deitz demurred, claiming he did not have enough experience in those matters to qualify as an expert.
Dr. Deitz' responses to both direct and cross-examination were carefully phrased to protect his on-going client-patient relationship and to enhance his patient's quest for custody. Having chosen to testify as Deborah Sheiman's advocate, rather than as an impartial witness offering neutral information to a court in need, Dr. Deitz damaged his credibility.
Stuart Sheiman did not offer John Pioli, Ph.D., his therapist, as a witness. Plaintiff wife requested the court to draw an adverse inference from that failure. The court will not do so. The Family Relations Counselor was empowered to contact him and did so to her professional satisfaction. As can be seen by the court's reaction to Dr. Deitz, this court does not believe there is much value in the traditionally cautious comments of a therapist seeking to protect his on-going therapeutic relationship. The interests of justice would not be served in this fact situation by either compelling Dr. Pioli to testify or by drawing an adverse inference from his failure to testify.
The remaining witnesses were Elaine Haut, the Family Relations Counselor who performed a custody study requested by Judge Edgar W. Bassick III, plaintiff mother and defendant father.
Elaine Haut, after contacts with each parent, the minor child, each parent with the child in each parent's home, the child's maternal grandmother, ten doctors including Deitz and Tec and Pioli, one of the housekeepers, the Trumbull police and Carol Rubin, the child's teacher, recommended that Amanda's physical and legal custody should be with the defendant father. CT Page 4310
Plaintiff mother's counsel called Counselor Haut to the stand and examined her directly for almost nine hours. Father's counsel cross-examined her directly for an hour and fifteen minutes.
As witness, Counselor Haut was unpretentious and non-defensive. She was thoughtful and even handed, avoiding a partisan defense of her recommendations. Of those testifying as experts, she was the most credible in spite or her more humble credentials. She testified to her Bachelor's degree in elementary education, her modest exposure to psychology and early childhood development courses during her undergraduate years, her work experience as a teacher, her learning disability courses, her work as a teacher-librarian, her experience as conference coordinator at the Yale Conference Center, her job as executive secretary at Textron Lycoming, her experience as a Family Relations Counselor since July, 1987 and the ongoing workshops and training offered by the Family Relations Division.
She dealt with the probing with dignity. She admitted she had no experience in understanding the differences among the psychological tests administered during the evaluation process. She admitted that neither her education nor her training qualified her to evaluate the evaluations she received. She was respectful of, and responsive to, the questions posed to her.
Counselor Haut reported that the single most important factor in reaching her conclusion was the quality and quantity of time father spent with Amanda versus the time or lack of involvement of the mother with Amanda. She reported defendant father was with Amanda Monday, Tuesday, Wednesday and Thursday evenings until Amanda's bedtime and weekends, largely at mother's request.
Counselor Haut testified that once she received Dr. Tec's opinion that neither parent was unfit, she relied on it.
Counselor Haut questioned plaintiff mother's motivation when mother increased her time with Amanda by withdrawing one night from father's visitation after mother received the Haut study questioning her maternal commitment.
Counselor Haut testified to speaking with plaintiff mother before 11am and observing that she seemed to have awakened her: Mrs. Sheiman slurred her words and spoke in fragmented sentences. Catherine Mingolello testified similarly.
Plaintiff father claimed that when he returned Amanda at night, her mother was rarely at home. Haut sought corroboration CT Page 4311 of father's claim and reported that Amanda told her, "Mommy isn't home a lot. Mommy's away." And the child did not know where. Counselor Haut also reported that plaintiff mother told her the housekeeper didn't cook dinner at night because neither she nor her daughter were home at night. In addition, Jennifer, a housekeeper, told Counselor Haut that sometimes Mrs. Sheiman was at home and sometimes she was not.
Counselor Haut also testified she dismissed joint custody because mother and father "are clearly unable to function" jointly. "They say nothing positive about each other."
Both mother and father have rather extensive medical histories. Mrs. Sheiman has phobias that effect her ability to use escalators and drive on highways and bridges. She testifies to an underactive thyroid and hypoglycemia. She has had surgery for a ruptured disc. Mr. Sheiman has Chrone's Disease. He suffered a heart attack eight years ago and a subsequent angioplasty.
Mr. Sheiman testified to his wife's confinement in a mental institution prior to their marriage, a fact he claimed she withheld until after the marriage. Mrs. Sheiman offered no information about that claim. Her marital diagnoses range from bipolar disorder (interchangeably spoken of as hypomania and manic depression) to depression. Her depression, of whatever degree, combined with her phobias, clearly impacted her life and their marriage in substantial ways. Her testimony and her behavior under oath were not reassuring. She was often evasive dealing with custodial issues, claiming stress, forgetfulness or advice of counsel when challenged.
In matters custodial she was not credible. The extensive access of father to Amanda at mother's request, Amanda's ingestion of mother's medication, mother's pattern of locking herself in her own bedroom until Amanda cried in order "to teach Amanda boundaries", mother's comments of "we lost" to Amanda when she first heard Haut's recommendations, her highlighting of an absent gift in 1991: "Amanda's still working on her father to get me something for Chanukah", her refusal to acknowledge her Husbands' friends as such and her presentation of half truths when testifying to incidents that impacted custody — all of these issues combined, in differing degrees, to effect her credibility in the custodial issues presented to the court.
She was diffuse and uncentered. She lacked focus. Her choices were often erratic, her decisions were often capricious. She often seemed focused on trivialities. She made much of her complaint that Stuart and his parents spoke in loud voices. She enrolled in a real estate course but she neither earned CT Page 4312 a real estate license nor finished the course. She took acting classes, cried theatrically during the trial and then testified she was not shown how to exhibit emotions during her acting classes.
Defendant husband was more focused, less erratic. He offers a more cohesive behavior pattern. The court does not see the father as embodying custodial perfection. He has erred. He has misbehaved. Never-the-less, of the two, defendant husband is the better custodial option. Each of the parents, unfortunately, is flawed. Parental limitations will be addressed in the court's findings regarding counseling, below.
FINDINGS: CAUSE OF THE BREAKDOWN
Neither party is assigned sole responsibility for the breakdown of the marriage. Each contributed to some degree. Of the two, the court finds wife's behavior to have been marginally more responsible for the marital breakdown.
FINDINGS: COUNSELING
The court notes that both parents as well as the minor child have all recently undertaken counseling to enable them to deal with the stress generated by this continuing custodial confrontation. It is clear that unless the parents improve their communication and parenting skills, the pressures on young Amanda, generated by their behaviors, will accelerate and eventually overwhelm her. She is increasingly fragile and vulnerable, Her mental health is in jeopardy. Her parents' custodial aggressions have diminished their communication skills and eroded their parenting skills, seriously impacting on Amanda's ability to cope. If the best interest of Amanda are to be served, those skills must be increased.
The Appellate Court, in Savage v. Savage, 25 Conn. App. 693, at 700 (1991), while rejecting ongoing parental evaluation after a case has been disposed of by the rendition of a final judgment, does make note, at page 699, of General Statutes Section 46b-56: "That section provides in part that `the court may at any time make . . . any proper order regarding . . . custody and visitation if it has jurisdiction . . . according to its best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable.'"
This court finds that the conditions and limitations of mandating such ongoing parental counseling, in which Amanda may participate, is essential to her best interests and is equitable under all the circumstances. CT Page 4313
Such counseling is not for purposes of post-judgment evaluation. It shall be absolutely privileged except that the counselor shall report to the court whether or not the parties attended the sessions and cooperated in the process.
FINDINGS: FINANCIAL
Stuart Sheiman's fiscal evasiveness, his attempts to circumvent the requirements of full and timely financial disclosure and production, his challenge to Mrs. Sheiman and to the court to fight their way through his obscure financial information, his elusive financial testimony and his refusal to document his fiscal status, all combined to deny him credibility with regard to the financial issues.
The court is saddened to have reached such a conclusion, particularly because Mr. Sheiman is an officer of this court, a Commissioner of the Superior Court. By his own testimony, he is experienced in the ways of the Family Court. He knows better. He, and his brothers and sisters at the bar, must understand that Commissioners of the Superior Court will not be granted lower standards of full and accurate and timely financial disclosure. They are expected to be voluntarily forthright regarding their personal finances. They may not present portions of puzzles and challenge their spouses, or the court, to solve them. Nor is it proper to behave in such a manner as to make it necessary for the trial court to compel production during the trial itself.
As a direct result of this behavior by defendant father, plaintiff wife required additional use of her counsel's time and incurred additional attorney's fees.
The circumstances in this case differ from the facts in Blake v. Blake, 211 Conn. 485, at 488 (1990) in which our Supreme Court found that "punishment of a litigant should play no role" in awarding attorney's fees. Here, it would be inequitable for this court to stand by while plaintiff absorbed the financial burden of defendant's evasive behavior. Here, the award of counsel fees is not a punishment. It is an equitable measure, reasonable and appropriate to the circumstances. The award has been limited to the added costs inappropriately incurred.
The court finds the defendant father's weekly income from his professional practice to be approximately $3000 a week. Although accepting the defendant's listing of his monthly gross receipts and his deductions for taxes and mandatory insurance., as well as many of the items listed by him as business expenses, the court rejects much of his listing of business liabilities of $9272 a month, or $111,264 a year. There was no credible CT Page 4314 evidence that Mr. Sheiman incurred each of those liabilities throughout the fiscal year.
Taking into consideration Mrs. Sheiman's educational and professional background and experience, this court finds her to have a net earning capacity of $30,000 a year, or a net of approximately $575 a week. During the marriage, she earned her Master's Degree in marriage and family therapy and has since become a clinical member of the Connecticut Association of Marriage and Family Therapists and been licensed by the State of Connecticut as well as having become a sex therapist. She has established a private practice and has been employed by a number of private and public employers: Hallbrooke, a residential facility for juvenile boys and two dating services. Mrs. Sheiman has substantially increased her earning capacity during the marital years.
The court wishes to express its appreciation to both attorneys Wechsler and Kent for their professional demeanor. Both provided competent and aggressive representation while maintaining an atmosphere of civility and mutual respect.
ORDERS:
Having reviewed the evidence and the sworn financial affidavits of each party in the context of the required considerations set forth in Title 46b, Chapter 815j of the Connecticut General Statutes, the following orders shall enter:
1. CUSTODY
a. Defendant father shall have sole custody of the minor child.
2. ACCESS
a. Plaintiff mother shall have reasonable rights of access to her daughter, Amanda.
b. Reasonable rights of access shall include the following:
i. weekday visitation, from after school to 5:30 pm.
ii. alternating weekends, from Friday after school to Sunday at 5 p.m.
iii. parents shall alternate Memorial Day, Labor Day, Thanksgiving Day, Amanda's birthday, Rosh Hashana, Yom Kippur, Purim, Passover and Hanukkah. Father will establish the alternating schedule. Father shall have Father's Day, mother CT Page 4315 shall have Mother's Day.
iv. two weeks of uninterrupted vacation during July or August. Father shall have a similar two uninterrupted week period during the summer months.
v. Plaintiff mother shall provide access transportation.
vi. This court specifically empowers, and encourages, the parties to vary any portion of the access schedule in any mutually agreeable manner.
3. CHILD SUPPORT
a. Child Support Guidelines are found to be inapplicable due to the incomes generated by these parties.
b. Plaintiff mother shall pay no child support to defendant father.
4. MEDICAL INSURANCE
a. Defendant father shall continue to maintain medical insurance coverage for the minor child, Amanda.
b. All unreimbursed medical, dental, optical, orthodontia, prescription and psychological expenses, and all other expenses related to the physical and mental health of Amanda shall be divided equally between the two parties.
c. Section 46b-84(c) of the Connecticut General Statutes shall apply.
5. TAX EXEMPTION
a. Defendant father will be entitled to claim Amanda as his tax exemption.
b. Plaintiff mother is directed to execute any tax documents necessary to achieve that result which are presented to her for her signature by defendant father.
6. ALIMONY
a. Defendant father shall pay plaintiff mother periodic alimony in the amount of $600 per week until June 30, 1996 or until plaintiff mother's death, remarriage or cohabitation pursuant to statute or until defendant father's death, whichever shall first occur. CT Page 4316
b. The term of the alimony period shall be non-modifiable.
7. 24 GARWOOD ROAD, TRUMBALL, CONNECTICUT
a. Plaintiff mother shall transfer her interest in the Garwood Road property to defendant father forthwith.
b. Plaintiff mother shall be responsible for and shall save defendant father harmless from all encumbrances of record.
9. PERSONAL PROPERTY
a. Plaintiff shall retain title to the 1984 Oldsmobile 88. Defendant shall retain title to the 1983 Oldsmobile 98.
b. Defendant shall retain his law practice and all the assets thereof. Plaintiff shall retain her counseling practice and all the assets thereof.
c. Defendant shall retain title to his stamp collection. He shall have no interest in plaintiff's negligence claim. Plaintiff shall retain all her jewelry.
d. Plaintiff shall transfer her interest in Canterbury Estates to defendant upon payment by defendant of $4500, which payment shall be made by him on or before December 31, 1992.
e. Plaintiff is to retain those bank accounts, stocks, bonds and mutual funds, and insurance listed on her sworn financial affidavit dated April 9, 1992. Defendant is retain those similar listings, together with pension and retirement plans set forth on his sworn financial affidavit dated April 8, 1992.
f. The balance of the personal property is to be equitably divided between plaintiff and defendant. If the parties are unable to agree upon the division of that balance, all disputed items are to be sold by defendant's counsel and the net proceeds of the sale are to be divided equally between the parties. There is to be no recourse to the courts to resolve any such personal property issues.
10. LIABILITIES
a. Defendant father shall be responsible for each of those debts listed by him on his sworn financial affidavit under section III B. Personal Liabilities thereof and totaling $122,077. CT Page 4317
b. Plaintiff mother shall be responsible for each of those debts listed on her sworn financial affidavit under section III. Liabilities thereof except the $35,150 1989 Federal Income Tax, which Husband lists and shall assume.
11. COUNSEL FOR THE MINOR CHILD
a. Counsel for the minor child, Attorney Sari B. Jaffe, is awarded a balance of $13,830 for her services and costs after crediting her receipt of $4000 as a retainer.
b. Each party is responsible for one-half of that balance due, or $6915, payable $576.25 on the first day of July 1992 and on the first day of each month thereafter until the final payment on June 1, 1993.
12. COUNSEL FEES
Defendant father shall pay plaintiff mother $5000 towards her counsel fees within ninety days hereof.
13. INFORMATION
a. Father shall keep mother informed of all major developments involving Amanda's health and education.
b. The court notes, and hereby quotes, the provisions of Section 46b-56(e) of the Connecticut General Statutes:
 "A parent not granted custody of a minor child shall not be denied the right of access to the academic, medical, hospital or other health records of such minor child unless ordered by the court for good cause shown."
c. This court enters no orders contrary to this right of access and, further, directs defendant father to comply with the letter and with the spirit of this right.
d. Father shall notify all academic and health care providers of mother's name and address, when provided by her from time to time, and of her right to their records.
14. LIFE INSURANCE
Defendant Father shall provide a $100,000 policy of term insurance on his life naming the minor child as beneficiary throughout her minority.
15. COUNSELING CT Page 4318
a. Defendant father shall forthwith initiate communication and parenting counseling with a qualified psychologist or psychiatrist of his choice, scheduled for the convenience of both plaintiff and defendant.
b. Plaintiff mother shall participate without cost to her.
c. Amanda shall be included as deemed appropriate by the counselor.
d. All of the participants are to make their medical and psychological histories and reports available to the counselor at the counselor's request. This memorandum and the Family Relations report are also to be provided.
e. Scheduling of conferences shall be determined by the counselor, whose relationship with the parties shall be absolutely privileged, except that the counselor shall report to the court whether or not the parties attended the sessions and cooperated in the process.
f. The process shall begin with a series of no less than four consecutive weekly sessions.
g. Unless otherwise mutually agreed by both mother and father, father's choice of counselor is limited to someone with whom neither parent has had earlier contact.
16. APPEAL
All the foregoing orders with respect to custody and access shall stand and operate as interim order of this court during the pendency of any appeal.
JOSEPH L. STEINBERG, JUDGE